# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                          )
CHERYL ANN HEALY,                         )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          Civil Action No. 12-30205-DJC
                                          )
CAROLYN W. COLVIN, [1]                     )
Acting Commissioner,                      )
Social Security Administration,           )
                                          )
          Defendant.                      )
_____ )
```

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **March 27, 2014**

## I.      Introduction

Plaintiff Cheryl Ann Healy ("Healy") filed claims for disability insurance benefits

("SSDI") and supplemental security income ("SSI") with the Social Security Administration

("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), Healy brought this action for judicial review of the final decision of Defendant

Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the

Commissioner"), issued by an Administrative Law Judge ("ALJ") on August 18, 2011 denying

her claim. D. 1. Before the Court are Healy's Motion to Reverse or Remand the Decision of the

Commissioner, D. 18, and the Defendant's Motion to Affirm the Commissioner's Decision, D.

---

[1] The original complaint was filed against Michael J. Astrue, but because Carolyn Colvin became the Acting Commissioner of Social Security on February 14, 2013, she has been substituted as the Defendant. Fed. R. Civ. P. 25(d).

23.  In her motion, Healy argues that the ALJ erred in denying her claim because:  (1) the ALJ overlooked evidence that Healy's back pain, plantar fasciitis and sleep apnea were severe impairments; (2) the ALJ failed to analyze Healy's impairments under SSA Listing 1.00: Musculoskeletal System; (3) the ALJ improperly considered Healy's failure to follow prescribed treatment; and (4) the ALJ did not afford controlling weight to the treating physician's 2009 residual functioning capacity ("RFC") assessment.  D. 19. at 12-20.  For the following reasons, the Court ALLOWS Healy's Motion, but only to the extent that it seeks a remand to the ALJ for further proceedings and findings regarding the Musculoskeletal System Listings analysis, and DENIES the Commissioner's Motion to Affirm as to this issue.

## II.    Factual Background

Healy was 50 years old at the time of the ALJ hearing, R. 66,[2] and reported that her date of disability was May 11, 2006.  R. 256.  She had previously worked as a nursing home aide, hotel cleaner, "solderer" and printing press operator.  R. 88-89.  In her application for SSDI and SSI, Healy alleged disability due to a combination of arthritis of the knee and spine, scoliosis, torn meniscus, sleep apnea, mild chronic obstructive pulmonary disease ("COPD"), anxiety and depression.  R. 172.

## III.   Procedural Background

Healy filed claims for SSDI and SSI with the SSA on July 23, 2007, R. 521, asserting that she was unable to work as of May 11, 2006.  R. 256.  Her claims were denied after initial review on October 26, 2007, R. 172-75, and Healy requested a review by a Federal Reviewing Official on November 9, 2007.  R. 176.  The Federal Reviewing Official subsequently denied Healy's claims on September 25, 2008.  R. 107-114.

---

[2] "R." refers to the administrative record that is filed at D. 17.

On November 4, 2008, Healy filed a timely request for a hearing before an ALJ.  R. 180.

A hearing was held before the ALJ on January 11, 2010.  R. 10-57.  In a written decision dated

February 18, 2010, the ALJ determined that Healy was not disabled within the definition set out

by the Social Security Act and denied her claims.  R. 115-28.

The Decision Review Board of the SSA notified Healy on May 20, 2010 that it was

vacating the decision and remanding her case to the ALJ with specific instructions to clarify

certain analysis.  R. 134-37.  A second hearing was held before the ALJ on June 21, 2011.  R.

58-104.  On August 18, 2011, the ALJ notified Healy that she had denied her claims on remand,

R. 138-40, and provided a second written explanation of her decision.  R. 141-66.

On October 24, 2011, Healy filed a request for review of the ALJ's second decision.  R.

6-7.  The Appeals Council denied the request on September 28, 2012, thereby making the ALJ's

decision the final decision of the SSA.  R. 1-4.

## IV.     Discussion

### A.     Legal Standards

#### 1.     *Entitlement to Disability Benefits and Supplemental Security Income*

To receive SSDI and SSI benefits, Healy must show she has a "disability," defined in this

context as an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or has

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The inability must be severe, rendering the

claimant unable to perform any previous work or any other substantial gainful activity which

exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505.

The SSA must follow a five-step process to determine whether an individual has a disability and, thus, whether that individual's application for Social Security benefits will be granted. 20 C.F.R. § 416.920. All five steps are not applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's RFC is such that she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

2.      *Standard of Review*

This Court may affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ's findings of fact are conclusive so long as they are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Therefore, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), this Court may reverse or remand such decision with instruction to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

**B.      Before the ALJ**

*1.      Medical History Presented to the ALJ*

In support of the disabling conditions listed in her application for SSDI and SSI benefits, Healy presented the ALJ with extensive medical evidence spanning the period 2005 through 2010. Healy testified that she suffered from a combination of knee pain, back pain, sleep apnea, COPD, depression and anxiety. R. 68-69, 74, 76-77. On May 16, 2006, Healy was deemed unable to perform her job as a nursing home aide due to the onset of acute pain in her right knee that occurred while she was pushing a wheelchair. R. 521. Because Healy argues that the ALJ overlooked significant medical evidence on remand, the Court summarizes the medical evidence related to Healy's physical and mental impairments.

a.      Obesity

The ALJ considered Healy's history of morbid obesity. R. 148. On remand, the Decision Review Board specifically directed the ALJ to review the impact of Healy's obesity on her other medical conditions and to apply Social Security Ruling 02-1p. R. 136. With her weight fluctuating from 251 to 292 pounds between 2006 and 2010, Healy had been deemed morbidly obese by her primary care physician, Dr. Iverson. R. 485. The ALJ discussed that Healy's body mass index has ranged between 45 and 50, R. 148, but concluded that "although exacerbated by

her obesity, [Healy's] conditions were not caused by her obesity . . . [t]herefore, her obesity does not rise to the level of a listing or disability." R. 162. The ALJ referenced that Healy's physicians repeatedly recommended weight loss and exercise programs to Healy to reduce her obesity. R. 148-150, 154.

b.   Joint Pain

Healy's physicians indicated that over the years Healy's weight likely strained her joints, but medical evidence also shows that Healy maintained full range of motion and mobility despite her weight. R. 485, 523, 708. Healy had been diagnosed with osteoarthritis and joint pain since at least August 2006. R. 384. Dr. Iverson, Healy's primary care physician, indicated that Healy had a history of knee pain and had undergone surgery on her right knee in 1986. R. 523. Healy was referred to Dr. Raskin, an orthopedic specialist, for a soft tissue mass in her right knee in August 2006. R. 384. After physical examination and an MRI, Dr. Raskin observed that "there is no significant urgency for biopsy or excision of this mass." Id. Dr. Raskin noted that Healy ambulated without a limp but had tenderness in her knee. Id. He recommended monitoring the knee for changes. Id.

In December 2006, Dr. Iverson recorded that Healy's upper body strength, range of motion and movement were normal. R. 523. Dr. Iverson observed that there was no swelling or tenderness in Healy's hands, wrists, elbows, ankles or feet. Id. There was "little tenderness" in Healy's knees and Healy "appear[ed] to walk fairly comfortably, some minimal limp." Id. Dr. Iverson recorded in January 2007 that Healy had been diagnosed with osteoarthritis of the spine and knees, but had no instability in those joints. R. 491. An April 2007 x-ray taken of Healy's right foot revealed no bone abnormalities or fractures, although there was indication of bone spurs. R. 510. In May 2007, Dr. Iverson saw Healy again for "worsening of her right knee

pain," which Dr. Iverson observed was causing a "diminished range of motion." R. 488. Dr. Iverson referred her for follow up with Dr. Raskin for additional orthopedic evaluation. Id. In July 2007, Dr. Iverson recorded that Healy continued to experience knee and lower back pain. R. 485. While noting that the physical examination indicated "exaggeration of the lumbar curvatures" and marked popping in her right knee, Dr. Iverson recorded that Healy had no muscle atrophy and maintained "full range of motion" of both her spine and knee. Id.

In March 2008, Dr. Iverson recorded that Healy's knee pain caused her "difficulty ambulating, joint locking, joint stiffness and joint swelling." R. 611. Healy's back pain caused "limited range of motion and muscle stiffness." Id. Dr. Iverson described the consequences of this pain as an "impaired quality of life." Id. Yet, the examination notes on Healy's muscle functioning from that same exam concluded that "[g]ait is free from ataxia and dysmetria. No scoliosis or spine curvatures. No pain with range of motion. Muscle strength is 5/5 throughout." R. 612.

On August 3, 2010, Healy saw rheumatologist Dr. Brown regarding her worsening knee pain. R. 708. On a one to ten scale, Dr. Brown recorded Healy's pain was a zero when sitting and a six or seven when standing. Id. He also noted that Healy was swimming twice a week for exercise. Id. Dr. Iverson's notes from examination in June and July of 2010 indicate in the physical exam notes that Healy was "ambulating normally." R. 712, 716. Dr. Iverson also recorded that Healy was swimming three times per week and was going on vacation. R. 710. In October 2010, Dr. Iverson again recommended weight loss and pool therapy for joint pain relief. R. 758. Healy tried several different injections for pain relief in her knees with Drs. Iverson and Brown, R. 753, 756, yet, as late as November 2010, Dr. Brown stated that Healy had not

experienced "lasting benefit" from any the injections.  R. 753.  Dr. Brown started the Euflexxa injection treatment in December 2010.  R. 752.

### c.      Plantar Fasciitis

Healy visited the emergency room at Baystate Medical Center in April 2007 due to symptoms of cellulitis on her feet.  R. 489.  Dr. Iverson saw Healy for follow up care after the emergency room visit and indicated in her notes that upon physical examination, Healy no longer presented symptoms of cellulitis.  Id.  In June 2008, Dr. Iverson noted that Healy was concerned about her plantar fasciitis.  R. 608.  In February and August 2009, Dr. Iverson recorded that Healy continued to suffer from plantar fasciitis.  R. 670, 672.  Dr. Iverson's treatment notes after the August 2009 exam included that Healy needed to treat her plantar fasciitis with "Tylenol Arthritis, glucosamine, aquatic exercise and gradual [weight] loss."  R. 670.

### d.      Sleep Apnea

Healy underwent a sleep study in February 2007, which revealed that she had "very mild obstructive sleep apnea . . . accompanied by only minimal hypoxemia."  R. 511.  The recommended treatment was smoking and alcohol cessation along with a diet and exercise program to reduce Healy's morbid obesity.  Id.  Dr. Iverson characterized Healy's sleep apnea as mild in June 2008, R. 608, but then suspected it was worsening in February and August 2009 because Healy was not using the CPAP machine.  R. 670.  Dr. Ajello conducted a polysomnogram on Healy in September 2009 to evaluate Healy's sleep apnea, concluding her "mild to moderate obstructive sleep apnea was effectively treated by CPAP at 7cm H2O" and recommending she continue using the device for four to six weeks to evaluate its long-term effectiveness.  R. 657.  Dr. Iverson also conducted an independent polysomnogram on Healy in

September 2009, which stated that Healy "slept well" throughout the overnight evaluation.  R. 663.

e.     Mental Health Conditions

The record reflects Healy's depression and anxiety disorder, dating back to February 2007.  R. 620-211.  Healy was admitted to Cooley Dickinson Hospital's psychiatric unit in October 2009 due to reported suicidal thoughts.  R. 687-88.  This was Healy's first psychiatric admission.  R. 689.  After a stay of approximately ten days, Healy was discharged from Cooley Dickinson to Franklin Medical Center's partial hospitalization program.  R. 695.  Dr. Iverson recorded that Healy attended the partial hospitalization program for six weeks, R. 715, although Healy testified that the program was only two weeks.  R. 67.  Then, Healy continued seeking therapy with counselors through ServiceNet, with whom she had been working since 2007.  R. 395-416.

2.     *RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services*

In the record there were two evaluations, completed by Dr. Barry Poret from UMMC Disability Evaluation Services on January 31, 2007, R. 392-94, and by Dr. Shankar Narayan on September 27, 2007.  R. 547-54.  Dr. Poret noted that Healy's "gait was very cautious and slightly antalgic and she uses a cane to balance herself," R. 393, and observed that there was no apparent effusion or warmth of the right knee upon examination.  Id.  The remainder of the physical examination indicated an overall normal range of motion in her neck, arms and back, with mild scoliosis.  Id.  Dr. Poret opined that Healy is "mostly limited because of her knee pathology associated with her morbid obesity."  R. 394.  Upon independent examination, Dr. Narayan also observed that Healy had arthritis in her right knee and used a cane, but recorded that she was able to "walk independently without device."  R. 548.  His recommended RFC

9

stated that Healy could frequently lift ten pounds, occasionally lift twenty pounds, stand up to two hours in an eight hour workday and sit up to six hours in a eight hour workday.  Id.  The evaluation indicated a limited range of motion in her knees, R. 548, and a combination of impairments, including obesity, arthritis, neck and back pain, R. 549, which occasionally limited Healy from climbing, balancing, stooping, kneeling, crawling and crouching.  R. 549.

Dr. Iverson completed two questionnaires regarding Healy's functionality:  (1) a physical RFC assessment in January 2009, R. 650-56 and (2) a medical report on Healy for the Massachusetts Department of Transitional Assistance in September 2010, R. 736-41.  In the 2009 RFC assessment, Dr. Iverson stated that Healy could lift up to ten pounds and stand or walk for at least two hours in an eight hour workday, but that Healy also must periodically alternate between sitting and standing to relieve pain.  R. 651.  Healy was limited in her pushing and pulling with both her upper and lower extremities.  Id.  Additionally, Healy should never kneel, stoop, crawl or crouch, R. 652, and she was limited from reaching in all directions, R. 653.  In the 2010 report, Dr. Iverson listed osteoarthritis, hypertension, sleep apnea and morbid obesity as Healy's medical conditions, stating that she was physically limited in her bending, reaching and standing on her feet for too long.  R. 740.  Where the questionnaire asked whether Healy had a "physical, mental health or cognitive impairment affecting [her] ability to work," Dr. Iverson checked "yes" and indicated the impairment was expected to last for more than one year.  R. 741. The questionnaire did not ask Dr. Iverson to specify which medical condition was preventing Healy from working or if it was a single or combination of impairments.

### 3.    ALJ Hearing

At the June 21, 2011 administrative hearing, the ALJ heard testimony from two witnesses, Healy and vocational expert ("VE"), Larry Tocci.  R. 60.  The ALJ acknowledged that

the Decision Review Board had instructed her on remand to focus on Healy's obesity and mental health after her stay at Cooley Dickinson Hospital. R. 61-62.

Healy testified as to the constant joint pain in both of her knees, stating that the Euflexxa liquid cartilage injections had helped the left knee but not the right knee. R. 68-70. Healy specified that the pain was in the back of her left knee and under her right kneecap. R. 69. Healy informed the ALJ that Dr. Stevens had determined that surgery was not an option because the main problem was the overall lack of cartilage in Healy's knees, which could not be reconstructed. R. 70-71. Healy explained that standing for longer than five minutes bothered her knees, as did sitting for "too long," bending and climbing stairs. R. 71. Healy clarified that sitting for approximately thirty minutes caused her pain, at which point, she had to elevate her legs to waist level for thirty to forty-five minutes. R. 78-79. After elevation, Healy testified to being able to resume activity for about another hour before the pain would return and she would need to elevate her legs again. R. 79. Healy mentioned that her cane helped relieve the pressure on her legs when walking. R. 77-78. Healy estimated she spent about ten hours per day sitting in a chair. R. 80.

Regarding her plantar fasciitis, Healy answered that the burning and pain started after standing for five minutes, but then agreed with the ALJ that the condition "comes and goes" and was not a chronic condition. R. 74. Healy reported taking Meloxicam for overall pain, which helped address her knee, back and foot pain. R. 76-77. "Walking, standing, climbing, [and] bending" reportedly triggered pain in all three areas. R. 76. Healy furthered testified to using her CPAP machine to alleviate her sleep apnea, but rated her energy level generally to be a three on a one to ten scale. R. 84.

When asked about a dietary and exercise weight loss plan, Healy responded that her physicians had not created one.  R. 72.  The ALJ asked whether Healy was aware of any dieticians or other resources available to help her craft a weight loss plan and Healy responded affirmatively.  R. 72-73.  Healy stated that she had seen a dietician at Cooley Dickinson Hospital, which did not help because of her tendency to binge.  R. 73.  When asked whether she saw a therapist to understand the underlying emotional reason for her binge eating, Healy responded that she had stopped seeing a counselor because she did not think it was helping her.  R. 82-83.  Healy explained that she felt depressed about her weight, pain and immobility and stated that she only had about two "good days" per week.  R. 85.  On a "good day," Healy testified that she could shower, dress herself and complete chores around her house.  R. 85.  On other days, Healy said she would spend most of her day sleeping, watching television or binge eating, and might not shower, get out of bed or change her clothes.  R. 83-85.  Healy testified that she had been sober for four years, since June 13, 2007.  R. 84, 95.

The ALJ first asked the VE if there was any skilled, sedentary work that Healy could perform, given the limitations that she would need to use a "cane for long distance ambulation, avoid concentrated exposure of respiratory irritants [and] limited overhead reaching."  R. 99.  The VE replied that Healy could work as an information clerk, order clerk or press operator, jobs that all had a skilled vocational preparation ("SVP") level of 4, or a sorter, which had a SVP of 3.  R. 99-100.  All four jobs existed in the national and Massachusetts economies in significant numbers.  R. 100.  The VE clarified that sedentary jobs are defined as positions where the worker is sitting for at least two-thirds of the workday.  R. 101.  The VE also answered that some of these jobs would permit a sit-stand modified work environment as needed.  Id.  Healy's attorney asked the VE if these jobs would permit Healy to recline thirty to forty minutes per hour of

sitting and the VE responded they would not.  R. 101-02.  When asked about the need to stay home from work two to three days per week, the VE again replied that there would not be full-time work for such a person.  R. 102.

### 4. Findings of the ALJ

The ALJ divided the record into two separate time periods:  May 11, 2006 through June 13, 2007, Healy's sobriety date, and then from June 14, 2007 through the decision date.  R. 142. Following the five-step process outlined in 20 C.F.R. § 416.920, the ALJ found that Healy had been unable to work during the first time period, R. 145, but was capable of alternative work during the second period.  R. 166.  However, because Healy's substance abuse was a "contributing factor material to the determination of disability" under 20 C.F.R. § 416.935 and Healy could have adjusted to other work if she had stopped her substance abuse, as addressed by 20 C.F.R. § 416.920(g), the ALJ concluded that Healy was not disabled under the Social Security regulations during either time period.  R. 166.  Healy does not dispute the ALJ's conclusions regarding her substance abuse being characterized as a contributing factor to the disability determination during the first time period.  See D. 19.

### a. Benefits Eligibility for Period Spanning May 11, 2006 through June 13, 2007

During the first period, the ALJ found at step one that Healy had not engaged in substantial gainful activity since May 11, 2006.  R. 144.  At step two, the ALJ found that Healy suffered from multiple severe impairments:  obesity, dysthymia, adjustment disorder, joint pain in her knees and substance abuse.  Id.  At step three, the ALJ found that Healy did not have any single or combined impairments that were severe enough to meet the listed impairments in the Social Security regulations.  Id.; 20 C.F.R Pt. 404, Subpt. P, App. 1.

13

Before proceeding to step four, the ALJ determined that Healy had the RFC "to perform light work," except that she was "unable to report to work more than four days per month due to inebriation or side effects of inebriation." R. 145. Based on these limitations, the ALJ determined at step four that Healy could not perform her past work. Id. At step five, considering Healy's age, education, work experience and RFC, the ALJ determined that there were no jobs that existed in the national economy that Healy could perform. R. 145. Healy does not dispute any of the ALJ's findings during this time period. See D. 19.

b.      Benefits Eligibility for Period Beginning June 14, 2007

Returning to step two to analyze the time period beginning June 14, 2007, the ALJ determined that Healy had several of the same severe impairments – obesity, dysthymia, adjustment disorder and joint pain in her knees. R. 146. Due to her sobriety, the ALJ modified Healy's substance abuse impairment to a "history of substance abuse." Id. Healy argues that the ALJ also should have included back pain, plantar fasciitis and sleep apnea as severe impairments at step two. D. 19 at 12. At step three, the ALJ again found that Healy did not have any impairment, individually or in combination, severe enough to meet the Appendix 1 listings because Healy only had "mild restrictions" on activities of daily living and "moderate difficulties" with social functioning, concentration, persistence and pace. R. 146-47. The ALJ further stated that Healy had no repeated episodes of decompensation of an extended duration. R. 147. As requested by the Decision Review Board on remand, the ALJ highlighted that she specifically had taken into account Healy's obesity and the Social Security Ruling on obesity ("SSR 02-1p") when determining Healy's RFC before step four. R. 147. The ALJ determined Healy had the ability to perform "light work," except that she could stand and walk for no longer

than two hours in an eight hour workday and needed to use a cane for long distance ambulation.

R. 147. Healy's RFC also included the following modifications:

> [A]void concentrated exposure to respiratory irritants, hazards such as unprotected heights, ladders and ropes. She is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. She can perform no more than occasional overhead reaching with her left dominant arm. She has no limits on her memory or on her ability to interact with coworkers, supervisors, and the general public. She is able to maintain concentration, persistence, and pace for 2-hour blocks of time. She is able to adapt to routine changes in a workplace setting.

R. 147. Healy disputes the ALJ's finding that she is able to perform "light work." D. 19 at 19-20.

At step four, the ALJ found that Healy was unable to perform any of her past relevant work. R. 164. At step five, however, the ALJ concluded that Healy was "capable of making a successful adjustment to other work that exists in significant numbers in the economy." R. 166. Therefore, the ALJ concluded that Healy was not disabled during this time period, June 14, 2007 to August 18, 2011. Id.

### C. Healy's Challenges to the ALJ's Findings

Healy disputes the ALJ's determination that Healy has the RFC to perform "light work" during this latter time period because this RFC failed to incorporate several impairments and limitations. First, Healy argues that the ALJ erred at step two by overlooking the evidence of chronic back pain, plantar fasciitis and sleep apnea, three physical conditions that prevented her from performing "light work." D. 19 at 12. Second, Healy contends that her obesity compounded the severity of her joint pain, impairing her ability to walk and rising to the level of severity described in Listing 1.00 of Appendix 1. D. 19 at 14. Third, Healy argues that the ALJ erred by stating that Healy was obese because she failed to follow prescribed treatments to lose weight. D. 19 at 17. Finally, Healy claims that the ALJ improperly ignored the additional

postural limitations that her treating physician, Dr. Iverson, included in her 2009 physical RFC assessment, which should have been given controlling weight. D. 19 at 19. For the reasons discussed below, the Court remands to the ALJ solely for reconsideration of the evidence of Healy's musculoskeletal disability, as analyzed under Listing 1.00 of Appendix 1, and finds no other legal or factual errors.

1.    *Medical Evidence of Back Pain, Plantar Fasciitis and Sleep Apnea*

The ALJ did not err at step two because she evaluated all of the evidence of these physical conditions and determined, within her authority, that they did not rise to the level of a "severe" impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). "A mere diagnosis is insufficient to establish that an impairment is severe[,] as defined by the regulations." Church v. Astrue, No. 10-cv-30236-FDS, 2012 WL 369424, at *8 (D. Mass. Feb. 2, 2012) (citing 42 U.S.C. § 423(d)(2)(B)). "An impairment or combination of impairments is 'severe' if it significantly limits an individual's physical or mental ability to perform basic work activities, which in turn is defined as 'the abilities and aptitudes necessary to do most jobs.'" Church, 2012 WL 369242, at *8 (citing 20 C.F.R. §§ 404.1520(c), 1521(b)). "The claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice." Id. (citing 20 C.F.R. §§ 404.1508, 416.908); Grady v. Astrue, 894 F. Supp. 2d 131, 142 (D. Mass. 2012) (noting that "[a] plaintiff's description of symptoms and limitations cannot by itself establish disability; the ALJ must also consider objective medical evidence and any other available evidence, such as medications and daily activities, to determine whether the plaintiff's testimony is consistent with the remainder of the record"). The ALJ has discretion to determine whether an impairment is severe, so long as she demonstrates that she reviewed the entire

medical record and has "substantial evidence" to support her finding.  See Noel v. Astrue, No. 11-cv-30037-MAP, 2012 WL 2862141, at *6 (D. Mass. July 10, 2012).

Even if an ALJ overlooks some single piece of evidence, the error will be deemed harmless so long as the ALJ has "explicitly considered 'all symptoms,' both severe and non-severe, in assessing Plaintiff's residual functional capacity and there is no indication that the ALJ failed to consider the cumulative effect of these impairments."  Perez v. Astrue, No. 11-cv-30074-KPN, 2011 WL 6132547, at *4 (D. Mass. Dec. 7, 2011) (finding failure to analyze arthritis a harmless error where ALJ had reviewed all relevant symptoms and determined other severe impairments existed).

The ALJ sufficiently reviewed the medical evidence regarding all of Healy's alleged symptoms and her conclusion that Healy was not severely impaired by back pain, plantar fasciitis or sleep apnea was supported by the record.  The ALJ recognized that Healy had been diagnosed with each of these three conditions at some point, but reasonably relied on substantial evidence that these diagnoses did not prevent Healy from being mobile or functional.  While Healy points to several places in the record where physicians diagnosed these conditions, there is no evidence to support that any of these three conditions substantially impaired Healy to the extent to warrant recognition as "severe" at step two.  The ALJ noted Healy's back pain several times throughout her decision, but concluded that the record did not support a finding that this pain limited Healy further than the ALJ recognized in her RFC.  Dr. Iverson's physician notes in July 2007 stated that Healy reported lower back pain, but that the physical examination indicated Healy had full range of motion in her spine and no spinal tenderness.  R. 485.  Despite Healy's report that her ability to walk, stand and lift was compromised by this pain, Dr. Iverson's notes concluded that Healy had "no significant limitations."  Id.  In the September 2007 medical

report, Dr. Iverson again noted that Healy had osteoarthritis in her spine and knees, but recommended aquatic exercise and weight loss as treatment. R. 529.

The two records that Healy points to in her motion reflect those physicians' documentation of a past condition, not a finding that her back pain limited her mobility or work ability. Dr. Poret recorded complaints of low back pain and degenerative disc disease in his symptoms summary, R. 392, but his physical examination revealed "mild scoliosis," "no paravertebral or vertebral tenderness in her lumbar spine," and normal strength. R. 393. Dr. Poret's disability conclusion mentioned only Healy's knees, not her back. R. 394. Similarly, Dr. Iverson's 2007 exam notes state "[b]ack shows normal curvatures" and "no spinous tenderness or paraspinuous spasm." R. 491. Additionally, the ALJ pointed out that the physician notes from April 2010 logged that Healy reported "no back pain" at that time. R. 155. These references in the ALJ's opinion demonstrate that the ALJ gave appropriate consideration to Healy's back pain; and nothing in the record suggests that this conclusion constitutes error.

While the ALJ focused the majority of her opinion on Healy's pain, she also addressed Healy's sleep apnea and plantar fasciitis. The Court concludes that the ALJ gave both medical conditions appropriate consideration, proportionate to their presence in the record and their overall impact on Healy's work ability. The ALJ recognized that the February 2007 sleep study revealed that Healy's sleep patterns were borderline abnormal, yet reasonably concluded that the recommended treatment of diet, exercise and smoking cessation suggested that Healy's sleep apnea required minimal treatment. R. 149. Dr. Iverson's exam notes from 2007 and 2008 further confirmed that Healy's sleep apnea was being effectively treated by the CPAP machine. R. 608, 657, 663. Additionally, the ALJ considered that the 2009 sleep study showed "mild to moderate obstructive sleep apnea/hyponea syndrome, which was effectively treated by CPAP,"

R. 151, and confirmed during the hearing that Healy used the CPAP machine. R. 84. Turning to plantar fasciitis, Healy points only to Dr. Iverson's medical notes on two dates to support her argument. R. 608. Neither of these records suggested that the condition was either chronic or debilitating, R. 670, 672, and Healy agreed in her testimony that her plantar fasciitis was not chronic. R. 74. Both records include the diagnosis under the broader category of osteoarthritis, R. 670, 672, which supports the conclusion that it was appropriate for the ALJ to focus her impairment analysis on the foremost cause of the pain – joint pain – during her step two analysis. By mentioning Healy's foot pain in her written opinion, R. 149, and asking Healy about it during the hearing, R. 74, the ALJ verified that she did not ignore medical evidence of plantar fasciitis.

Furthermore, Healy misreads the ALJ's RFC regarding her walking ability. In her motion papers, Healy argues that the ALJ erred because "the plaintiff cannot walk for two hours at a time." D. 19 at 13. However, the ALJ stated that Healy could walk a maximum of two hours per day in an eight hour workday, not walk for two hours at a time. R. 147. This limitation, along with the requirement for sedentary work, is consistent with Dr. Iverson's recommended RFC and sought to accommodate Healy's knees, back and foot pain. R. 651-53.

After reviewing the record, this Court concludes that Healy has not met her burden of demonstrating that the ALJ overlooked Healy's symptoms associated with back pain, sleep apnea or plantar fasciitis when she crafted Healy's RFC.

2. *The ALJ Erred by Not Applying the Evidence to Musculoskeletal System Listing 1.00*

Healy contends that the ALJ should have explained how she evaluated Healy's impairments under musculoskeletal Listing 1.00 of Appendix 1 at step three of her analysis. D. 19 at 14. While "it is the claimant's burden to show that [s]he has an impairment or impairments which meets or equals a listed impairment in Appendix 1," <u>Torres v. Sec'y of Health and Human</u>

Servs., 870 F.2d 742, 745 (1st Cir. 1989), it is the ALJ's responsibility at step three to analyze thoroughly all of the impairments she recognized at step two. 20 C.F.R. § 404.1520(a)(4)(iii) (requiring that "[a]t the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled"). Having concluded that obesity and joint pain were both severe impairments at step two, the ALJ should have also analyzed these impairments under the listings at step three. R. 146. Although the ALJ issued an extensive and otherwise thorough decision, her failure to analysis the impairments under the musculoskeletal listing constitutes an error, warranting remand for further analysis on this issue. Arsenault v. Astrue, 937 F. Supp. 2d 187, 189 (D. Mass. 2013) (reversing and remanding based on ALJ's failure to evaluate claimant's impairments under Listing 1.02 at step three).

Healy highlights that the SSA provides guidance that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." Titles II & Xvi: Evaluation of Obesity, SSR 02-1P, 67 Fed. Reg. 57859, 58760 (S.S.A Sept. 12, 2002). At step three, the ALJ should "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." Id. The SSA also directs the ALJ to specifically review a claimant's ability to walk under Musculoskeletal Listings 1.00, 1.01 and 1.02 ("the Musculoskeletal Listings")[3] when it is possible that obesity substantially impacts an underlying condition, such as degenerative joint disease:

---

[3] Listing 1.00 describes Musculoskeletal System conditions, including degenerative joint disease. 20 C.F.R. § 404, Part P, App. 1. Listing 1.00 states that obesity should be evaluated for its cumulative impact on degenerative joint disease. Id. § 1.00(Q). Listing 1.02 outlines

We may also find that obesity, by itself, is medically equivalent to a listed impairment . . . . For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b[4] or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

SSR 02-1P at 58762. The ALJ acknowledged in her opinion that Healy's attorney made this precise argument at the hearing, R. 163, but the ALJ did not provide any analysis or explanation as to whether she considered any of these Musculoskeletal Listings when evaluating Healy's joint pain and obesity. "[T]he ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." Arsenault, 937 F. Supp. 2d at 189 (citing Reynolds v. Comm'r of Soc. Sec., 424 Fed. Appx. 411, 416 (6th Cir. 2011)). Furthermore, the Decision Review Board specifically instructed the ALJ to, on remand, "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence." R. 136. This instruction also pertained to her step three analysis.

The Court acknowledges that the ALJ discussed medical records regarding Healy's ability to walk at in her decision, R. 149, 151, 155-56; however, the ALJ did not state in her

---

dysfunction of the joints with "involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 101.00B2b." Id. § 1.02(A).

[4] Listing 1.00(B)(2)(b) states, in part: "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. § 404, Part P, App. 1. Healy testified that she could walk approximately one block and relied on friends to drive her around because she had difficulty walking to the bus stop. R. 76, 80-81. This is just one example of evidence that should be examined under the framework of the Musculoskeletal Listings on remand.

decision that she considered Listing 1.00, 1.01 or 1.02, or evaluated this medical evidence in light of the SSA's definition of "ambulate effectively." The ALJ only referenced Healy's mental health impairments and explained why Healy did not meet Mental Health Listing 12.00. R. 144, 146-47. It is true that the ALJ has discretion over which listings to include. "When analyzing whether a claimant has an impairment which meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations, it is perfectly reasonable for an ALJ to refer to the most specific applicable listing." Cranmer v. Astrue, No. 07-cv-11386-GAO, 2008 WL 3084706, at *5 (D. Mass. Aug. 5, 2008) (upholding that ALJ provided sound reasoning for applying Listing 1.02 and 1.03 rather than 1.08). Yet, the ALJ still must provide the reasoning for her selection of listings and conclusions, particularly where, as in this case, there is significant medical evidence of obesity and joint pain, including joint space narrowing, R. 512, which directly related to an applicable Musculoskeletal Listing. See Morrison v. Astrue, No. 11-cv-30156-MAP, 2012 WL 3527121, at *5 (D. Mass. Aug. 13, 2012) (distinguishing that "it was not necessary for the ALJ to explicitly consider whether Plaintiff's impairments equaled Listing 1.02 [] as there is no evidence in the record of ongoing joint-related impairments").

Even if there is sufficient evidence to support an ultimate conclusion that Healy could ambulate effectively, R. 149, 151, 155-56, the full rationale must be clear to the reviewing court to affirm the decision below. See Arsenault, 937 F. Supp. 2d at 188-89. "While the final outcome may well remain the same, [if] the record is not clear enough to support Defendant's arguments and reach a harmless error conclusion," then the Court may find a legal error. Costa v. Astrue, No. 08-395S, 2009 WL 3366961, at *11 (D.R.I. Oct. 15, 2009) (remanding to ALJ for "failing to expressly discuss and evaluate" which listing was applied at step two); Sawyer v. Colvin, No. 12-CV-231-JAW, 2013 WL 1760534, at *4-5 (D. Me. Mar. 30, 2013) (affirming

ALJ based on explanation that claimant had not met Listing 1.02). This Court concludes that the omission of any mention of Listings 1.00-1.02 in the ALJ's opinion requires the Court to make an impermissible inference regarding the ALJ's full consideration of Healy's impairments before it can affirm the ALJ decision. The Court, therefore, remands this issue to the ALJ for a complete consideration and analysis of Healy's impairments within the framework provided in Listings 1.00, 1.01 and 1.02. Arsenault, 937 F. Supp. 2d at 189.

3.     *The ALJ Did Not Inappropriately Consider Healy's Failure to Follow Prescribed Treatment*

Healy alleges that the ALJ wrongly determined that Healy's failure to lose weight constituted failure to follow prescribed treatment, thereby impacting the ALJ's denial of disability benefits. This is an inaccurate interpretation of the ALJ's opinion. The ALJ commented in her decision that if Healy had complied with treatment recommendations to exercise and lose weight, her symptoms likely would have been reduced. R. 160. This observation was supported by multiple physician recommendations in the record, R. 148, 149, 150, 154, and does not appear to be a factor that the ALJ ultimately used in determining Healy's disability.

Failure to follow prescribed treatment can prohibit a finding of disability under regulations in certain cases. "If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." 20 C.F.R. § 404.1530(b). The regulations state with clarity that this is a secondary analysis to be made after a claimant has been determined to be disabled. "Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s)." SSR 02-1P, at 58764. Healy admits that this treatment analysis is a secondary

argument, D. 19 at 17, yet contends that the ALJ was prohibited from mentioning Healy's treatment decisions because Healy was not found disabled. Id. at 18.

On this record, it is inaccurate to suggest that the ALJ's consideration of Healy's failure to follow prescribed treatment was a determinative factor in the resolution of Healy's disability claim. The ALJ expressly stated that she did not deny disability because of failure to follow treatment, R. 164; rather, the ALJ discussed Healy's attitude and response to physician-recommended weight loss and exercise as a measure for examining the credibility of her statements. Id. For example, Healy complained of debilitating pain and exercise intolerance, but then also reported swimming three times per week. R. 708, 710. During her testimony, Healy denied that her physicians referred her to a dietician or other weight loss resources, R. 72, then conceded that she had been sent to a dietician after her stay at Cooley Hospital. R. 72-73. The ALJ was well within her discretion to examine inconsistent statements regarding weight loss as part of her credibility evaluation. Carr v. Astrue, No. 09-cv-10502–NG, 2010 WL 3895189, at *6 (D. Mass. Sept. 30, 2010) (asserting ALJ is solely responsible for the credibility evaluation of claimant). Accordingly, consideration of this issue by the ALJ does not constitute error.

### 4. ALJ's Evaluation of Healy's Treating Physician's Medical Opinions

Lastly, Healy claims that the ALJ erred by not affording controlling weight to the RFC assessment of her treating physician, Dr. Iverson. D. 19 at 19-20. Healy asserts that by giving the January 2009 RFC opinion "little weight," R. 151, the ALJ overlooked important physical limitations that prevented Healy from performing "light work." D. 19 at 19-20. Healy cites that "light work" requires "some pushing and pulling of arm or leg controls," which Healy was unable to perform according to Dr. Iverson's 2009 RFC assessment. Id. at 20 (quoting 20 C.F.R. §§ 404.1567(b)).

An ALJ should give controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the opinion is inconsistent, either internally or with other evidence, the administrative law judge has discretion to 'downplay' that treating physician's assessment." Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004). "Regardless of whether or not the administrative law judge decides to discount the treating physician's opinion, the decision 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.'" Rodriguez v. Astrue, 694 F. Supp. 2d 36, 42 (D. Mass. 2010) (quoting SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996)); see Abubakar v. Astrue, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *9-10 (D. Mass. Mar. 21, 2012) (noting that ALJ has discretion to assign weight to medical opinions based on consistency with overall record). If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight to which the opinion is entitled based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination," (2) "[n]ature and extent of the treatment relationship," (3) "[s]upportability" of the medical opinion, (4) consistency of the opinion "with the record as a whole," (5) "[s]pecialization" of the treating source, and (6) "other factors . . . that tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c). The ALJ is not required to discuss each factor under 20 C.F.R. § 404.1527(c) in her decision. Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011) (stating that "an ALJ is not required to methodically apply [the factors] so long as the ALJ's decision makes it clear that these factors were properly considered"). "Even in the context of a treating-source opinion, the requirement is merely that the adjudicator supply 'good reasons'

for the weight given [to] that opinion." Crocker v. Astrue, No. 07-220-P-S, 2008 WL 2775980, at *9 (D. Me. June 30, 2008) (quoting 20 C.F.R. § 404.1527(c)(2)).

The ALJ adequately explained her assessment of Dr. Iverson's 2009 RFC assessment at several points in her opinion and relied on the totality of Dr. Iverson's physician notes when crafting Healy's 2011 RFC. R. 151-52, 156-57. Both Dr. Iverson's and the ALJ's RFCs restrict Healy from standing or walking more than two hours per work day and permitted only occasional balancing and climbing. R. 147, 151. The restrictions of capping Healy's weight lifting at ten pounds and limiting her ability to push and pull, reach overhead, stoop and kneel were rooted in Dr. Iverson's notes over the four year period. R. 151. The ALJ's stated reason for reducing the weight assigned to Dr. Iverson's conclusion was that the doctor's "assessment was inconsistent with the longitudinal history noted above, including the physician's own treatment notes." R. 152. Dr. Iverson's January 2009 RFC limitation on pushing, pulling and reaching in any direction was contradictory to Dr. Iverson's February 2009 examination notes documenting that Healy was "swimming three times a week and feeling better with movement." R. 151. From 2008 through 2010, Dr. Iverson's notes frequently documented that Healy's gait and ambulation were normal and there was no mention of weight-lifting limitations. R. 149, 151, 155-56. Additionally, Dr. Iverson's June 2010 examination notes stated that Healy had "normal movement in all extremities." R. 156. Furthermore, notes from a June 2010 examination by her treating rheumatologist, Dr. Brown, indicated that Healy has good range of motion in her knees and shoulders. R. 155-56. This evidence corroborated the ALJ's conclusion that, as of 2010, Healy did not have significant limitations on either her upper or lower body movement, including her ability to push or pull as needed. Taken as a whole, the ALJ reasonably concluded that "[t]his evidence would corroborate the claimant's ability to engage in

light exertional activity with the minimal limitations for standing and walking," R. 155, as "light work" is defined in 20 C.F.R. §404.1567(b).

It is also apparent from the opinion that the ALJ considered the factors that she was obligated to consider when reducing the weight given to Dr. Iverson's 2009 RFC assessment. The ALJ was not required to list out each factor individually, as long as she cited "good reasons" that support the factors. 20 C.F.R. § 404.1527(d)(2). The ALJ discussed a multitude of Dr. Iverson's notes throughout her written decision, but placed little weight of the physician's 2009 RFC assessment because it was inconsistent with subsequent physician notes regarding Healy's limitations. Moreover, even as it is not clear from the record whether Dr. Iverson saw Healy in person before issuing the 2009 RFC assessment, there are no physical examination notes to support the additional upper body functional limitations that Dr. Iverson refers to in that 2009 assessment form. R. 650-56.

Healy cites to Rodriguez, 694 F. Supp. 2d 36, as the basis to support that the ALJ "is not permitted to ignore the reports and opinions of examining and treating sources based on [her] own personal assessment unaided by any medical expert." Rodriguez, 694 F. Supp. at 46. The Court recognizes this important principle, but finds this case distinguishable because this ALJ did not completely disregard Dr. Iverson's opinion like the ALJ in Rodriguez. In this case, the ALJ sufficiently demonstrated, through her lengthy written review of the evidence, that she considered all of Dr. Iverson's notes, along with those of Dr. Brown and other treating physicians, before crafting Healy's final RFC.

This Court determines that the ALJ provided an adequate explanation and finds no error in her decision to assign Dr. Iverson's 2009 RFC assessment "little weight."

**V.  Conclusion**

For these reasons, Healy's Motion to Reverse or Remand the Decision of the Commissioner, D. 18, is ALLOWED only insofar as the Court REMANDS the Commissioner's decision to the ALJ for reconsideration and further explanation of Healy's impairments as analyzed under Musculoskeletal Listings 1.00, 1.01 and 1.02 of Appendix 1.  The Defendant's Motion to Affirm the Commissioner's Decision, D. 23, is DENIED as to this issue.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge